UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LAWRENCE H. GRESS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 17 C 8067 |
| ) | |
| REGIONAL TRANSPORTATION AUTHORITY, an ) | Judge Rebecca R. Pallmeyer |
| Illinois Municipal Corporation; PACE SUBURBAN ) | |
| BUS SERVICE, A DIVISION OF THE REGIONAL ) | |
| TRANSPORTATION AUTHORITY, an Illinois ) | |
| Municipal Corporation; SUSAN RUSHING, ) | |
| Individually; ROCKY DONAHUE, Individually; ) | |
| LINDA SWEDLUND, Individually; JANIKA ) | |
| MILLER, Individually; THOMAS J. (T.J.) ROSS, ) | |
| Individually; MARTIN SANDOVAL II, Individually; ) | |
| and SENATOR MARTIN SANDOVAL, Individually; ) | |
| and Unknown and Unnamed Defendants, ) | |
| ) | |
| Defendants ) | |

## MEMORANDUM OPINION AND ORDER

Lawrence Gress applied for and was denied a job at Pace, the Suburban Bus Division of the Regional Transportation Authority (RTA), an Illinois municipal corporation. Gress's belief that Pace violated the law by choosing another candidate for the position generated this lawsuit. In his original complaint, filed in 2017, Gress alleged that Pace's failure to hire him was a product of age and race discrimination. After Judge Coleman of this court dismissed certain other claims [20], Gress expanded his theories of wrongdoing to include a claim under the Racketeer Influenced and Corrupt Organizations Act ("civil RICO"), 18 U.S.C. §§ 1961–1968, in which he alleges that Pace's decision not to hire him stemmed from a racketeering enterprise engineered by then-state senator Martin Sandoval. Defendants RTA, Pace, and Pace employees Susan Rushing, Rocky Donahue, Linda Swedlund, Janika Miller, T.J. Ross, and Martin Sandoval II (the late Senator Sandoval's son) have jointly moved for partial dismissal of Gress' Second Amended Complaint [102]. Specifically, they seek dismissal of Gress' § 1981 race discrimination and civil

RICO claims (Counts IV and VIII, respectively), and to strike Gress's request for punitive damages.

**BACKGROUND**

Federal Rule 8 directs that a complaint present "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Far from "short and plain," Gress's Complaint meanders through eight counts, ninety pages, and 525 paragraphs, most of them devoted to detailing corruption scandals in Illinois that relate—sometimes loosely—to Martin Sandoval, a state senator from 2003 to 2020. (*See, e.g.*, Second Am. Compl. (hereinafter "SAC") [80] ¶¶ 46–183, 202–21, 385–408, 445.) In reviewing these allegations, the court adheres to familiar standards, and will "accept as true all factual allegations in the complaint and draw all permissible inferences in plaintiff['s] favor." *Degroot v. Client Servs., Inc.*, 977 F.3d 656, 659 (7th Cir. 2020) (alteration in original). Finally, when an otherwise sufficient complaint "admits all the ingredients of an impenetrable defense," it is subject to dismissal. *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004). In the summary that follows, the court limits its discussion to facts relevant to this motion.

**I.  Factual Background**

Headquartered in Arlington Heights, Pace is a large paratransit service that provides free rides to people in six Illinois counties covering an area of "approximately 3,450 square miles," including Chicago. (*Id.* ¶¶ 42–44.) Pace is an "operating division" of the RTA—an umbrella organization, created by statute, which oversees transit agencies in Illinois. (*Id.* ¶¶ 38–40.) On March 25, 2016, Pace posted a job opening on its website seeking a "Community Relations Representative." (*Id.* ¶ 222, 224, 233.) The role involved marketing Pace services to, and liaising with, local businesses, public officials, and other organizations. (*Id.* ¶ 230.) Pace sought someone with a "Bachelor's degree in Business Administration, Political Science, Public Administration or related field," as well as two years' experience "in government affairs"; "[t]ransit

2

or government" experience, "[s]trong customer service skills," and "[f]luency in Spanish" were noted as desirable. (*Id.* ¶ 231.) The job carried a salary range of $56,043–$99,337. (*Id.* ¶ 232.)

"Online applications began rolling in" soon after Pace posted the job, and continued to trickle in through April. (*Id.* ¶ 233.) In the first thirty some-odd applications Pace received,[1] Gress singles out five applicants (Connor Fitzpatrick, Clint Sabin, Elizabeth Norden, Seville Spearman, and Sean Arden) whose credentials Gress claims made them "highly qualified" for the role. (*See* ¶¶ 233–37, 244–47.) As applicants filed online applications, Janika Miller, a Human Resources Specialist at Pace (*id.* ¶ 20), would forward them to Susan Rushing, Pace's Manager of Community Relations (*id.* ¶¶ 22, 236–37, 246).

Rushing and Miller began interviewing candidates on April 29, 2016, and spoke with three people—Sean Arden (identified above as "highly qualified") and two others, identified in the complaint by their last names only: Fischer and Lawson. (*Id.* ¶¶ 251–52.) Fischer and Lawson were already employed by Pace but, according to Plaintiff's allegations, "lacked the minimum qualifications" for the job. (*Id.* ¶ 252). On May 3, Pace interviewed three more applicants, all of whom were fluent in Spanish: Hernandez, Ortiz, (first names again not stated) and Martin Sandoval II ("Sandoval II"). (*Id.* ¶ 253.) Then, on May 11, Pace interviewed "another highly-qualified candidate," Joshua Steinberg. (*Id.* ¶ 263.) The Complaint alleges that of those interviewed, the two well-qualified candidates, Steinberg and Arden, never had a second interview. (*Id.* ¶ 268.) Instead, "only Ortiz and Sandoval [II] were called back for second interviews," which both occurred on May 16. (*Id.* ¶¶ 272–73.)

The Complaint describes Sandoval II as "a young, 20-something Hispanic male who had recently (in December 2012) graduated from Northeastern Illinois University with a Bachelor's degree in Psychology (not political science) and was enrolled at the University of Illinois, pursuing a master's degree in social work, which he expected to pursue while employed at PACE." (*Id.*

---

[1] All told, Pace would receive about 80 applications. (*Id.* ¶ 271.)

3

¶ 319.) Though Sandoval II spoke Spanish (*id.* ¶ 253), Sandoval II had "no transit or government-related experience; no Bachelor's degree in Political Science; less than two years of experience in government affairs if he had any at all; no experience developing and maintaining relationships between PACE and stakeholders of PACE in the Six-County Area; and no experience as a senior marketing officer, general manager, or sales director for any transit-based entity." (*Id.* ¶ 321 (emphasis in original).)

Plaintiff Gress also sought the position at Pace. Gress is more than 40 years old[2] and is non-Hispanic. (*Id.* ¶ 5.) He had worked for both Pace and RTA as a "marketer, manager and outreach coordinator," and had "established a nationally-recognized record of success" in that work. (*Id.* ¶¶ 303, 324–29.) His work at RTA lasted from 1993 to 2005, about five years of which he spent as a "human resources generalist manager" before transitioning to "the newly-created role of Manager of the RTA Transit Benefit program." (*Id.* ¶ 327.) He claims that "[b]y all accounts, [he] was remarkably successful in the new role." (*Id.* ¶ 328.) In 2005, he left "on good terms" and continued work "for various contractors of RTA and PACE," including spending 2012–2015 "market[ing] VENTRA-linked computerized human resource benefit programs to corporate executives in the Six-County Area on behalf of a contractor to PACE and CTA" and speaking "on behalf of PACE, in addition to RTA's other operating divisions," while marketing an "employer-provided benefit program" called RTA Transit Check to "senior human resource corporate executives" within RTA's jurisdiction. (*Id.* ¶¶ 329, 335, 337–38.) He had a Bachelor's degree in Political Science (as Pace's job posting demanded), and, though he lacked government experience, he had numerous years of transit-related experience. (*Id.* ¶ 331–32.) "Admittedly, Gress was not fluent in Spanish," but he stresses that Pace's job posting "said that was desirable,

---

[2] In his first complaint, Gress lists his age as sixty-six. (*See* Compl. [1] at 1.) That complaint was filed in November 2017; by the court's math, he is now in his early seventies.

4

but not required," and that "the previous incumbent (Mary Robb) had retired from the . . . position after receiving consistently positive reviews – without ever having fluency in Spanish." (*Id.* ¶ 343.)

On April 28 (four weeks after the position had been posted), "conclud[ing] that his qualifications were a close match" for what Pace was looking for, Gress faxed his resume to Pace "as his application" for the position.[3] (*Id.* ¶¶ 322—23.) He had heard nothing by May 16, when Pace was interviewing Ortiz and Sandoval II for the second time. (*See id.* ¶ 276.) On May 17, according to the Complaint, "Kirk Dillard, a Republican [former state senator] who became chairman of the RTA Board of Directors in June 2014, and was familiar with Gress, called [Rocky] Donahue"—Pace's Deputy Executive Director of External Relations—"to inquire about Gress' application and to recommend that Gress be given serious consideration" for the job. (*Id.* ¶¶ 24, 276.)[4] After getting this call, Donahue and Linda Swedlund, Donahue's executive administrative assistant, asked Miller, the HR specialist, "whether Lawrence Gress had submitted an application" for the position. (*Id.* ¶ 277.) One of Miller's staff members at Pace "searched only among the online applications submitted through Pace's website" and, finding no application for Gress there, determined that he had not submitted one. (*Id.* ¶¶ 277–78.)

By that afternoon, Rushing had prepared a "Justification to Hire" document recommending that Pace hire Sandoval II. (*Id.* ¶ 279.) And the following morning, May 18, Donahue sent an email to Rushing stating, "This is approved. I will be in Friday to sign the original but you can start the process now if you want. Thanks, Rocky." (*Id.* ¶ 283.)

Then, a few hours later, Miller found the resume Gress had faxed back in April to apply for the position; she forwarded it to Swedlund, "who shared it with Donahue." (*Id.* ¶ 285.) The

---

[3] Instead of filling out the online application and emailing a resume (as others did), Gress' Complaint states that he sent only his resume, and did so via fax, not email. (*See id.* ¶ 285.) The Complaint does not explain whether faxing was an accepted means of filling the application, nor does Gress allege that sending a resume alone—by email or otherwise—was sufficient without also filling out an additional, separate application.

[4] It is noteworthy that Gress, who complains of "crony hiring" at RTA, called on a politically connected individual to push his own candidacy.

Complaint alleges that when Donahue saw the resume, he "decided that the best course was quickly to conclude the hiring of the pre-selected candidate so that Dillard's inquiry would not result in any disappointing news for Sandoval." (*Id.* ¶ 286.) Miller called Sandoval II and offered him the job at some time between May 18 and May 31, and on the latter date informed Rushing that "Martin has accepted the position" but would not start work until late June. (*Id.* ¶ 288.)

The story was not over. The Complaint surmises that "Donahue, Swedlund, Rushing, Miller and the other RICO Conspirators decided that Rushing and Miller would conduct a sham interview of Gress, in order to mollify Dillard and hide any appearance of corruption or favoritism in the hiring process." (*Id.* ¶ 290.) So, on June 9, Rushing told Miller to schedule an interview with Gress "subject to [Rushing's] availability." (*Id.* ¶ 291.) On June 13, Miller suggested some time slots for that interview in an email to Rushing; the same day, Miller, "at the behest of other RICO Conspirators," sent a conditional offer of employment by mail to Sandoval II. (*Id.* ¶¶ 292–93.) Plaintiff alleges that Defendants viewed it as "important to interview Gress to create a false appearance that all highly qualified applicants had been interviewed, especially one recommended by the RTA Chairman." (*Id.* ¶ 295.)

On June 14, Rushing scheduled an interview with Gress for the following day. (*Id.* ¶ 296.) Gress alleges that he spent "time and money to appear" for what he calls "a sham interview . . . for a position that was no longer available." (*Id.* ¶ 297–98.) That interview, according to Plaintiff, "confirmed he was an ideal and uniquely qualified candidate for the Community Relations Representative position." (*Id.* ¶ 304.) So, when he had heard nothing by July 19, Gress checked in with Rushing by email. Then, on July 28th, Miller mailed Gress a rejection letter, thanking him and stating that, though "the decision was a difficult one," Pace had "concluded that another candidate is best suited to our specific requirements at this time." (*Id.* ¶¶ 311–12.) Gress "was shocked by Miller's letter" and replied on August 1 with a "threat[] to investigate whether Pace had in fact selected another candidate who possessed superior qualifications, in accordance with Pace's standard hiring procedures." (*Id.* ¶ 317.) Pace did not respond. (*Id.* ¶ 318.)

6

**II.    Procedural Background**

Gress filed a seven-count[5] Complaint against RTA, Pace, and several Pace employees on November 7, 2017, alleging claims of (reverse) race discrimination under Titles VI and VII of the Civil Rights Act of 1964; a claim under the Age Discrimination in Employment Act (ADEA); violatons of 42 U.S.C. § 1981 and 42 U.S.C. § 1983; and various claims under Illinois law. (Compl. [1] at 23–36.) In August 2018, the court granted Defendants' motion to dismiss several of Gress's claims, leaving just three claims intact (and as-yet unchallenged): Count I (Title VII) and Count III (ADEA) as alleged against Pace and its employee-defendants, and Count IV (§ 1981) as alleged against Pace, its employee-defendants, and RTA.[6] (Mem. Op. and Ord. [20].)

On August 26, 2019, as discovery progressed, Plaintiff filed an amended complaint adding a RICO claim (Count VIII) against a new Defendant—Martin Sandoval (Sr.) —in addition to the Pace Defendants, and alleging that "manipulating Pace into hiring Marty was the extortionate product of a wide-ranging racketeering enterprise masterminded by Marty's father, acting, in this instance, by and through Rocky Donahue and his subordinates at Pace." (Combined Resp. in Opp. to Mots. To Dismiss Second Am. Compl. (hereinafter "Pl.'s Resp.") [129] at 8; see Am. Compl. [45].) Principally, Gress contends that Pace's entire hiring process for the Community Relations Representative was "an elaborate charade" that Rocky Donahue orchestrated to give Sandoval II the job in return for Sandoval Sr.'s having awarded "Donahue's son Kevin a job at the Illinois Toll Highway Authority in 2012." (Id. ¶ 223.)

After Defendants filed separate motions to dismiss portions of his amended complaint, Gress amended once more and, on January 21, 2020, filed the Second Amended Complaint at issue here. In it, he alleges numerous forms of corruption on Sandoval's part, including a

---

[5]    The complaint names only seven counts, but lists two different counts as Count V. (Compl. at 30–31.)

[6]    At the time, the Defendants did not seek to dismiss Count IV; they have done so for the first time now, in response to Plaintiff's Second Amended Complaint.

7

"protection racket" whereby, between 2012 and 2019, he "extorted corrupt hires" from various municipal or state organizations for his daughters and daughter-in-law, for Donahue's son, and for an alderman named Cesar Santoy. (*See* Pl.'s Resp. at 10–11; SAC ¶¶ 202–21, 385–96, 405–08.)[7]

On March 16, 2020, Sandoval moved to dismiss the RICO claim (Count VIII of Gress's Second Amended Complaint) for failure to state a claim. (Def. Senator Martin Sandoval's Mot. to Dismiss Count VIII, of Pl.'s Second Am. Compl. [100].) Also on March 16, 2020, the remaining Defendants filed the motion now before the court. (Mot. to Dismiss [102].) Martin Sandoval died of COVID-19 on December 5, 2020. (Ex. 1 to Def. Senator Martin Sandoval's Mot. Pursuant to Rule 25 Noting His Death for the Rec. [133-1].) When Plaintiff failed to substitute a party for Sandoval within 90 days, the court dismissed the case against him pursuant to FED. R. CIV. P. 25(a)(1). (Minute Entry [144].) Remaining before the court is RTA and the Pace Defendants' partial motion to dismiss Gress' Second Amended Complaint.[8]

---

[7] Then-Senator Sandoval was in fact engaged in various corruption schemes at that time, including taking bribes in return for protecting "SafeSpeed," a red-light camera company seeking business in Illinois, between 2016 and 2019. *See* Plea Agreement at 2–9, *United States v. Sandoval* (2020) (No. 20-CR-00056). Federal prosecutors entered an information against him on January 27, 2020, in response to which he waived indictment and pleaded guilty the following day. (Pl.'s Resp. at 11–12; *see also* Information, *United States v. Sandoval* (Jan. 27, 2020) (No. 20-CR-00056); Waiver of Indictment, *United States v. Sandoval* (2020) (No. 20-CR-00056) (Jan. 28, 2020).)

[8] Gress was involved in at least two other (failed) civil RICO cases concerning the corruption scandals he mentions in his Complaint. *See South Branch LLC v. Commonwealth Edison Co.*, 46 F.4th 646 (7th Cir. 2022) (evoking filed-rate doctrine to foreclose civil RICO liability predicated on ComEd pay-to-play scheme, where Gress and others alleged paying higher electricity costs); *Gress v. SafeSpeed, LLC*, No. 20-cv-756, 2021 WL 3472631 (N.D. Ill. Aug. 6, 2021). In the latter case, the court found that Gress lacked standing to bring a civil RICO class action predicated on SafeSpeed receiving a red-light camera contract in Illinois through corruption. *Id.* at 13. Gress' alleged injury was a traffic ticket he received for running a red light, which the court pointed out meant that "[his] own conduct [as opposed to racketeering activity] was the direct cause of any injuries [he] suffered." *Id.* at *11.

**DISCUSSION**

In their motion to dismiss, Defendants argue that Count IV must be dismissed because § 1981 may not be alleged against municipal actors; that Plaintiff's RICO claims (Count VIII) must be dismissed for several reasons, including that Gress lacks standing; and that Gress's request for punitive damages in Counts I, IV, and VIII must be stricken because Pace and RTA, as municipalities, are immune from them. (*See* The Pace Defs. and RTA's Mem. in Supp. of their Mot. to Dismiss the Second Am. Compl. in Part (hereinafter "MTD Mem.") [103] at 1–2.) As explained below, the court agrees with Defendants on each of these issues.

**I.     Count IV:  42 U.S.C. § 1981**

42 U.S.C. § 1981 guarantees that:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a). Though "§ 1981 itself provides a remedy for violations committed by private actors . . . an injured party must resort to § 1983 to obtain relief for violations committed by state actors." *Campbell v. Forest Pres. Dist.*, 752 F.3d 665, 667 (7th Cir. 2014); *see also Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 735 (1989) ("[T]he express 'action at law' provided by § 1983 for the 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws,' provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor."). The limitation on bringing actions under § 1981 against state actors applies both to state entities and any individuals working for them. *See Jett*, 491 U.S. at 707 (holding that claim under § 1981 could not proceed against school principal); *Outley v. City of Chicago*, 407 F. Supp. 3d 752, 762–63 (N.D. Ill. 2019) (holding that plaintiff could not state a § 1981 claim against state employees, even by suing them in their individual capacities).

9

In Count IV, Plaintiff has sued "all Defendants" under § 1981, alleging that they "engaged in racially discriminatory practices while acting under color of law and thereby inhibited Gress' right to enter into an employment contract with PACE." (SAC ¶ 476.) The Complaint's allegations make clear, however, that the Defendants are state actors. In the Second Amended Complaint, for example, Plaintiff describes RTA as "a unit of local government"; Pace as "an operating division of RTA"; and "[o]ffice-holders of RTA and PACE" as "public officials . . . ." (*Id.* ¶¶ 7–8, 10.) Some case law is in accord. *See Hale v. Pace*, No. 09 C 5131, 2011 WL 1303369, at *7 (N.D. Ill. Mar. 31, 2011) ("[T]he Court considers Pace to be a state actor for the purposes of § 1983.").

Plaintiff makes no argument as to how the Defendants are not state actors. Instead, in his response brief, Plaintiff claims he "concedes that Count IV is subject to dismissal as to the RTA and Pace to the extent RTA and Pace are municipal actors." (Pl.'s Resp. at 23.) The parties do not meaningfully dispute that the Defendants are state actors. The court thus agrees that § 1981 is the wrong vehicle through which to sue them. Count IV is dismissed.

## II. Count VIII: Civil RICO

Meant to combat ongoing or organized crime, the RICO statute allows private plaintiffs to seek treble damages and attorney's fees if they can prove "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 336 (7th Cir. 2019) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496–97 (1985)); 18 U.S.C. §§ 1961–68. To state a civil RICO claim, "the plaintiff must allege that 'an injury to [his] business or property result[ed] from the underlying acts of racketeering.'" *Empress Casino Joliet Corp. v. Johnston*, 763 F.3d 723, 728–29 (7th Cir. 2014) (alterations in original) (quoting *Haroco, Inc. v. Amer. Nat'l B & T Co. of Chi.*, 747 F.2d 384, 398 (7th Cir.1984)). And a plaintiff's recovery is limited to "the extent that [ ] he has been injured in his business or property by the conduct constituting the violation." *Empress Casino Joliet Corp.*, 763 F.3d at 729 (alteration in original) (quoting *Sedima*, 473 U.S. at 496).

Injury to one's "business or property" is an essential requirement for a civil RICO claim. *Evans v. City of Chicago*, 434 F.3d 916, 924 (7th Cir. 2006), *overruled on other grounds*, *Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013). So too is the requirement to show that a "'pattern of racketeering activity' both factually and proximately caused" that injury. *RWB Servs., LLC v. Hartford Computer Grp., Inc.*, 539 F.3d 681, 686 (7th Cir. 2008) (quoting *Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 268 (1992)). Though *Evans* and earlier cases classified these requirements as jurisdictional, the Seventh Circuit has recently clarified that they are instead "non-jurisdictional element[s] of the cause of action Congress supplied in § 1984(c)," meaning that a "failure to plead this element . . . requires dismissal under Rule 12(b)(6), not 12(b)(1)." *Ryder v. Hyles*, 27 F.4th 1253, 1256 (7th Cir. 2022).

The court begins and ends with the threshold requirement of injury to business or property.

### A.    Injury to Business or Property

As noted, injury to some cognizable business or property interest is necessary to state a cause of action for civil RICO. *See Evans*, 434 F.3d at 924–25; *Ryder*, 27 F.4th at 1257. Moreover, the term "business or property . . . retains restrictive significance"; a plaintiff may not recover under civil RICO for "personal injuries suffered." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979); *see also Evans*, 434 F.3d at 927 (holding that pecuniary loss stemming from personal injuries was insufficient to confer standing under RICO). Plaintiff Gress alleges that he spent "time and money" to attend his interview with Pace in June 2016, but was ultimately passed over for the Pace job. (SAC ¶ 297–98.) And in reciting his RICO count, Plaintiff describes his injury in the following way: "The Sandoval Conspirators obtained money and property and deprived Plaintiff of money and property as a result of" their fraudulent patronage scheme; and "Plaintiff and countless other citizens have been injured in their business and property by reason of [Sandoval's corruption schemes] . . . including the opportunity costs and indignity associated with being used as a prop to camouflage fraudulent hiring practices . . . ." (*Id.* ¶¶ 522–23.) Beyond these statements, he alleges no specific harm to his business or property. The question becomes

11

whether either theory—a job prospect ("opportunity costs") or incidental "time and money" spent to attend a job interview—constitutes business-or-property loss sufficient to state a civil RICO claim. Neither does.

Gress had no property right in potential prospective employment. Courts may "look to state law to determine the meaning of a 'property' right pursuant to federal statutes such as RICO." *Evans*, 434 F.3d at 929 (citing *Doe v. Roe*, 958 F.2d 763, 768 (7th Cir. 1992)). Indeed, "[w]hile federal law governs most issues under RICO, whether a particular interest amounts to property is quintessentially a question of state law." *Doe*, 958 F.2d at 768. And in Illinois, "a person has a property interest in employment only where that person has a legitimate expectation of continued employment." *Evans*, 434 F.3d at 929 (citing *Fumarolo v. Chicago Board of Ed.*, 142 Ill.2d 54, 107, 566 N.E.2d 1283 (1990)). Gress had no "legitimate expectation of continued employment" at Pace; he was not employed at Pace at the time of his interview. Accordingly, his "opportunity cost" from losing prospective employment alone is insufficient to state "injury to business or property" for a civil RICO claim.

Fighting this result, Gress relies on criminal RICO cases, in particular *United States v. Sorich*, which found that harm to property sufficient to sustain an honest-services fraud conviction occurred as the result of the defendants "doling out thousands of city civil service jobs based on political patronage and nepotism." *United States v. Sorich*, 523 F.3d 702, 705, 709 (7th Cir. 2008). In that case (and its criminal context), the court noted that "salaries fraudulently obtained, and job opportunities fraudulently denied, represent property for purposes of mail fraud." *United States v. Sorich*, 523 F.3d 702, 713 (7th Cir. 2008) (internal citations omitted). This was because "the city paid for, and was cheated out of, qualified civil servants." *Id.* In other words, the city lost property by having its *own* jobs given to unqualified people. *Id.*; *see also United States v. Granberry*, 908 F.2d 278, 280 (8th Cir. 1990) (upholding federal fraud conviction where job applicant concealed the fact that he had been convicted of murder, noting that "[w]hat the School District wanted was a competent school-bus driver who was truthful and had not been convicted

of a felony, and this is not what it got.") If Martin Sandoval II was not qualified for the job Gress seeks, the analogous victim is Pace, not Gress. Gress had no entitlement to the job, and thus no reasonable expectation that he (or anyone else) would get the job.

Even putting aside Gress' lack of a property right in prospective employment, his theory of injury is speculative.[9] He identifies several other people who were "highly qualified" for the position at Pace, and several others who were interviewed for the position. He also alleges that his "application" (as the court understands it, nothing more than a faxed resume) was lost until a state senator called Pace and asked them to consider it several weeks into the hiring process, when other candidates were already being interviewed for a second time. Even with all inferences drawn in his favor, the court cannot conclude that Gress had any legitimate expectation that the Pace job—and its benefits—were his to lose. His being denied such a "speculative and amorphous" benefit, without more, does not constitute injury to business or property. *Evans*, 434 F.3d at 932.

Gress himself appears at times to recognize that a desire for prospective employment is insufficient to state a deprivation actionable under RICO. In his response brief, he writes that "[t]he Motion characterizes Gress's damages as consisting solely of a disappointed expectation as to future salary payments" when "[t]hat has never been the case." (Pl.'s Resp. at 15.) But then, in describing his injuries, Gress notes that "he drove 60 miles to attend a 'courtesy' interview scheduled after, unbeknownst to Gress, Marty had already accepted the job," and that "[b]eing duped into jumping through hoops to get a job that is no longer available by, among other things, traveling substantial distances can reasonably be characterized as an injury to one's business

---

[9] Neither side mentions the "lost chance" doctrine or suggests that it has any purchase in this context. *See Doll v. Brown*, 75 F.3d 1200, 1206–07 (7th Cir. 1996) (noting that the lost chance doctrine "strikes us as peculiarly appropriate in employment cases involving competitive promotion"); *Biondo v. City of Chicago*, 382 F.3d 680, 689–90 (7th Cir. 2001) (applying lost chance doctrine to firefighters who lost chance at promotion). In any event, that doctrine has not, to the court's knowledge, been applied in a failure-to-hire case, let alone to a civil RICO claim.

and property." (*Id.* at 15–16.) As far as the court can tell, then, what remains is Gress' allegation that he spent "time and money" to attend the interview with Pace, who, he alleges, had no intention of hiring him. (SAC ¶ 298.)

The court believes hiring decisions for non-policy-making jobs should be based on merit, not politics; and a meaningless interview, if that is what happened here, is a wasteful exercise. But Gress has not cited a single authority for the notion that a *de minimis* and incidental expense associated with participating in a job interview amounts to an injury to business or property sufficient to state a civil claim under RICO. Indeed, courts have found no business-or-property injury where a plaintiff allegedly incurred expenses that have not "give[n] rise to any legal interest in exchange" amounting to "a cognizable property interest." *Ryder v. Hyles*, No. 1:20-CV-01153, 2021 WL 7285358, at *3 (N.D. Ill. July 29, 2021), *aff'd as modified,* 27 F.4th 1253 (7th Cir. 2022) (finding no injury to business or property where churchgoers, who donated money to church and paid for "programs and church functions," were subjected to sexual abuse there). Viewing the allegations most favorably to him, Gress incurred expenses driving to his interview in exchange for a *chance* to compete for a job; but, as discussed above, Gress had no legal interest in that chance at employment.

Moreover, even if costs associated with his drive to Pace could constitute an injury to business or property, Gress has failed to plead such costs with any specificity. Importantly, "a cause of action does not accrue under RICO until the amount of damages becomes clear and definite." *Evans*, 434 F.3d at 932 (quoting *Motorola Credit Corp. v. Uzan,* 322 F.3d 130, 135 (2d Cir. 2003)). Gress's Complaint lacks any specificity as to the extent of incidental expenses associated with his interview. He never alleges, for example, how much if any money he spent on gas or other expenses he incurred in order to interview at Pace. His only specific expense-related claim—that he drove sixty-miles to attend the interview—is found nowhere in his Second Amended Complaint, surfacing only in his responsive briefing, and still lacks specificity as to a

concrete payment or property loss.[10] This "vague and disjointed" theory of damages, without anything more "concrete," further undermines any claim of injury. *Ryder*, No. 1:20-CV-01153, 2021 WL 7285358, at *3.

In the absence of contrary authority—and Plaintiff has pointed to none—the court concludes that paying for gas or other incidental expenses to drive to a job interview does not constitute injury to business or property.[11] Gress' RICO claim is dismissed.

### III.     Punitive Damages

Finally, the Defendants argue that Pace is immune from punitive damages on certain of Plaintiff's claims. Because the court has dismissed Counts IV and VIII, only Plaintiff's Title VII claim (Count I) remains subject to this dispute. (*See* MTD Mem. at 19–20.)

Claims under Title VII are limited to actions against employers, as opposed to employees in their individual capacities. *Williams v. Banning*, 72 F.3d 552, 552 (7th Cir. 1995); *Passananti v. Cook County*, 689 F.3d 655, 662 n.4 (7th Cir. 2012) ("Title VII authorizes suit *only* against the employer. Individual people who are agents of the employer cannot be sued as employers under Title VII.") Pace, as the employer, is thus the only Defendant subject to Count I of Gress' Second Amended Complaint.[12] In addition, Title VII bars punitive damages for actions against "a

---

[10]     It is not even clear the court can consider the sixty-mile figure, as it is an "axiomatic rule that a plaintiff may not amend his complaint in his response brief." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 442 (7th Cir. 2011). Since the figure does not change the court's conclusion, it considers it anyway.

[11]     The court need not address the issue of causation, but observes that even assuming Defendants' interview invitation to Gress constituted racketeering activity prohibited by 18 U.S.C. § 1961(1), it is not clear that this activity was the cause of Gress's injury. Gress has alleged that Pace would not have interviewed him but for Dillard's calling them on Gress' behalf, which prompted their search for his application. By then, several other candidates had been interviewed, casting doubt on the notion that a desire to cover up a patronage hiring scheme motivated their last-minute invitation to interview him. In other words, assuming (further still) that Gress has plausibly alleged (under Rule 9(b)'s high particularity bar for pleading fraud) that Defendants defrauded Gress by inviting him to interview, the Complaint's allegations cast doubt on whether that alleged fraud was even the true cause of his incidental harm.

[12]     The court dismissed Gress' Title VII claim (only) as to RTA in August 2018. (*See* Mem. Op. & Ord. [20] at 4–5.)

government, government agency or political subdivision . . . ." 42 U.S.C. § 1981a(b)(1). As discussed above, Pace is a governmental employer, and thus Plaintiff is unable to seek punitive damages against it. *See Sanders v. Chicago Transit Auth.*, No. 19-CV-04656, 2020 WL 5253867, at *10 (N.D. Ill. Sept. 3, 2020).

The court thus dismisses Gress' request for punitive damages as to Count I.

## CONCLUSION

Defendants' motion to dismiss [102] is granted. Counts IV and VIII of Plaintiff's Second Amended Complaint are dismissed with prejudice, as is his request for punitive damages as to Count I. What remains are Gress's discrimination claims. Although the parties have not addressed the issue in depth, the court notes Plaintiff's allegations that: (1) Gress faxed his resume to Pace (as opposed to filling out their online application) weeks into the application process, and that the resume did not even surface at Pace until Kirk Dillard prodded them to find it, on the day *after* Pace had conducted callback interviews with other applicants; and (2) that *several* "highly qualified candidates"—not just Gress—were passed over for the Pace job in favor of Martin Sandoval. These two allegations cast doubt on any causal link between alleged wrongdoing in Pace's hiring process and Gress' failure to get the position. The parties will be expected to address this issue at a status conference, now set for 10:00 a.m. on February 7, 2024 in Courtroom 2541.

ENTER:

Dated: January 23, 2024

_____
REBECCA R. PALLMEYER
United States District Judge

16